THE CITY OF NORTHFIELD et al.

*v.*

THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF ATLANTIC et al.

[Submitted July 12th, 1915. Determined July 20th, 1915.]

That the erection and operation by a county on its own land of a hospital for patients afflicted with pulmonary tuberculosis, would materially reduce the market value of adjacent real estate, did not justify

injunctive relief against the erection and operation of such hospital, where no danger to health existed or could be reasonably apprehended from the operation of the hospital, since a person cannot be denied the right to make a lawful use of his property merely because such use injures the market value of his neighbor's property.

On bill for injunction. Hearing on return of order to show cause for preliminary injunction.

*Messrs. Bolte, Sooy & Gill,* and *Messrs. Bourgeois & Coulomb,* for the complainants.

*Mr. Enoch A. Higbee,* for the Board of Chosen Freeholders; *Messrs. Endicott & Endicott,* for J. Mathis & Son.

LEAMING, V. C.

The bill is filed by the city of Northfield and several property holders of that municipality and prays that the board of freeholders of Atlantic county be enjoined from erecting and conducting at a certain place within the city of Northfield, a certain hospital which the board has determined to erect for the care of patients afflicted with pulmonary tuberculosis.

The county of Atlantic is the owner of a tract of land containing in area about one hundred and fifty acres, the major portion of which is within the boundaries of the municipality of Northfield; on this county tract the county asylum for the insane and the county almshouse are now located. The tract has a frontage on the shore road of seven hundred and seventy-five feet and extends back therefrom that width in a northwesterly direction something over three thousand feet. The insane asylum and almshouse are each located on this tract near and facing the shore road. The proposed hospital is to be erected in the rear of these buildings and at a point approximately in the centre of the county tract. This will place the hospital building about one thousand six hundred feet away from the other county buildings and about one thousand nine hundred feet from the shore road, and no part of the proposed building will be nearer than two hundred and fifty feet from the side boundaries of the county tract.

The complainant, city of Northfield, is a sparsely settled municipality, its territory consisting chiefly of farms and woodland; in area the municipality is about two miles square and contains a population of eight hundred and sixty-six according to the census of 1910; since that time the population has increased little if any. The individual complainants are property owners in the vicinity of the county tract, and some of them own farm land adjacent thereto.

The residence nearest to the proposed hospital building is that of complainant, Benjamin Risley, and is about nine hundred feet away; the residence of complainant, William Risley, is about one thousand two hundred feet away; that of complainant, Harry Collins, about one thousand five hundred feet away; no others appear to be nearer than one thousand eight hundred feet.

By act of April 21st, 1909 (*P. L. 1909 p. 421*), our legislature declared tuberculosis to be an infectious and communicable disease, and dangerous to the public health. That act contained various provisions designed to afford protection against the spread of tuberculosis. At the same session of the legislature (*P. L. 1909 p. 548*) a joint resolution made provision for a commission to investigate and report advice touching appropriate means to prevent the spread of tuberculosis. Pursuant to the report of that commission the legislature of 1910 (*P. L. 1910 p. 129*) made provision for the establishment of county hospitals for tuberculosis patients. In 1912 (*P. L. 1912 p. 340*), another similar and more complete act made provision for the establishment of county tuberculosis hospitals. It is under the provisions of the latter act that the present hospital is being erected. By act of March 21st, 1910 (*P. L. 1910 p. 93*), it is made unlawful for any hospital for the treatment of pulmonary tuberculosis to be located or established without first obtaining the consent and approval of the state board of health. The act provides for an application to the state board accompanied by a descriptive map of the premises proposed to be devoted to the use stated, and requires the state board then to fix a time and place for a hearing on the application and specifies the notices of the hearing to be

given. After the hearing the board either authorizes or refuses to authorize the establishment of the proposed hospital. Pursuant to this act application was made by defendant board to the state board of health for leave to construct and operate the hospital here in question at the place where it is now being constructed, and notice of the application was given pursuant to the requirements of the act. At the time fixed by the state board a hearing was had and the matter of location was considered and the state board determined the proposed location a suitable one and permission was then given for the defendants to establish the hospital at the place where it is now being constructed.

This legislation establishes a special tribunal to pass upon the question of appropriate location of hospitals of this nature. After an adjudication by that statutory tribunal, based on a hearing on adequate notice, that a given location is a proper location it would seem that this court cannot properly review that question or base relief upon the claim that the location is not a proper location. There is, however, some doubt in my mind whether that statute can be said to have been intended to include tuberculosis hospitals established by municipalities.

But I think it unnecessary fully to consider or determine what force should be here given to the adjudication of the state board touching the suitableness of the site selected.

The evidence submitted does not justify a conclusion that any danger to health exists or can be reasonably apprehended from the operation of this institution, providing it is properly operated. In this view the only possible ground for relief is the claim that the establishment of the hospital is operative to materially reduce the market value of the adjacent real estate. That claim, standing alone, cannot justify the relief here sought. There are some authorities apparently to the contrary, but the weight of authority is clearly to the effect stated. A person cannot be denied the right to make a lawful use of his property merely because such use is operative to injure the market value of his neighbor's property; he will not be permitted to disturb the quiet enjoyment of his neighbor's habitation by interference with the atmosphere by unreasonable noises, odors or gases; he

will not be permitted to physically disturb his neighbor's property, as by backing water upon it or otherwise physically interfering with it, but the mere disturbance of market value is not regarded as an infringement of an existing right in the party damnified and cannot be made the basis of relief of this nature. The rule is stated in *Wood Nuis.* (*2d ed.*) § *3,* as follows:

. "In order to create a nuisance from a use of property, the use must be such as to work a tangible injury to the person or property of another, or as renders the enjoyment of property essentially uncomfortable. It is not enough that it diminishes the value of surrounding property. It is not enough that it renders other property less salable, or that it prevents one from letting his premises for as large a rent as before, or to as responsible or respectable tenants. It must be such a use as produces a tangible or appreciable injury to the property, or as renders its enjoyment essentially uncomfortable or inconvenient. When the fact of nuisance is established, by showing it to be productive of results that bring it under that head, then the depreciation of the salable or rental value of the property may be considered in determining the damages therefrom; but the fact that the use produces such depreciation of itself is not sufficient to make the use complained of a nuisance.

"Thus, a business that, by reason of the fumes or vapors that arise from it, produces a visibly injurious effect upon vegetation by preventing its growth, or seriously injuring or destroying it, or that produces a visible damage to buildings or other property, may be a nuisance even though it does not render the enjoyment of life less comfortable, or produce any ill effects to the occupants of surrounding premises. So, too, a use of premises that, by reason of its peculiar results, renders the enjoyment of life uncomfortable, is a nuisance, although it produces no visibly injurious effect upon property of any kind: such as noise, so continuous and excessive as to produce serious annoyance, or vapors, or noxious smells that render the enjoyment of life uncomfortable, or that by reason of its extremely hazardous character creates a reasonable apprehension of injury therefrom, either to the lives or property of those in its vicinity—such as powder-mills or magazines in a town or city, or near dwellings or public roads. There are many unpleasant, and, indeed, offensive things, that must be borne with by the owners and occupants of estates, because although offensive to the eye or cultivated tastes of people, they do not trench upon any recognized legal right; and this is the case, even though the thing complained of materially lessens the value of surrounding property. An unobstructed prospect may greatly enhance the value of a dwelling, but this circumstance does not prevent the owner of adjacent estates from making erections thereon that completely hide or destroy it; so the presence of elegant buildings upon a street greatly enhance the value of property upon the street, either for dwellings or business purposes, but this does not prevent an owner of property there from making any species of erections thereon, however rude or cheap, which is not otherwise a nuisance. A tomb or

cemetery near dwellings is by no means calculated to be pleasant, either to the eye or the mind, and may, indeed, be a source of great annoyance to ordinarily nervous people, and, generally, it is likely to detract from the eligibility of a locality, either for habitation or for the purposes of business, and consequently detracts from the value of surrounding property; but neither a tomb, whether public or private, nor a cemetery in a city or village, is a nuisance, unless it in some manner affects the physical health of the occupants of dwellings in its vicinity, or becomes offensive by reason of stenches emitted therefrom. It may be stated as a rule reasonably well settled that neither a private or public tomb, or cemetery, is a nuisance, unless it corrupts the atmosphere by unwholesome or noxious stenches, or corrupts the water of wells or springs in the vicinity, or, because of the peculiar nature of the soil, impregnates it with unwholesome or noxious gases or substances. Such use of property is but a just exercise of dominion over property by the owner or occupant thereof, unless by some of the modes referred to it comes under the head of nuisance."

This view appears to have been uniformly entertained by this court. *Wolcott* v. *Melick, 11 N. J. Eq. 204; Ross* v. *Butler, 19 N. J. Eq. 294, 303; Cleveland* v. *Citizens Gas Light Co., 20 N. J. Eq. 201; Duncan* v. *Hayes, 22 N. J. Eq. 25, 29; Board of Health* v. *Trenton, 63 Atl. Rep. 897; Ventnor* v. *North American Home, 77 N. J. Eq. 464.* See also *Barry* v. *Smith* (*Mass.*), 77 N. E. *Rep. 1099; Frazer* v. *Chicago, 186 Ill. 480.*

I am obliged to deny preliminary restraint and will dismiss the order to show cause.